968 A.2d 140

Kenneth LONGUS

v.

STATE of Maryland.

No. 863 Sept.Term, 2007.

Court of Special Appeals of Maryland.

March 26, 2009.

Michael R. Malloy (Nancy S. Forster, Public Defender, on the brie), Baltimore, for Appellant.

Sharon S. Street (Dougolas F. Gansler, Atty. Gen., on the brief), Baltimore, for Appellee.

Panel: KRAUSER, C.J., JAMES R. EYLER and PAUL E. ALPERT (Ret., Specially Assigned), JJ.

KRAUSER, Chief Judge.

Convicted of robbery and second-degree assault by a jury sitting in the Circuit Court for Washington County, appellant Kenneth Longus presents two questions for our review:

1. Did the circuit court err in granting the prosecutor's motion to exclude two spectators from the courtroom during the testimony of a key prosecution witness?

2. Did the circuit court err in denying appellant's request for a continuance to obtain a defense witness?

For the reasons that follow, we hold that the circuit court did not abuse its discretion in either excluding two spectators from the courtroom during the testimony of a key prosecution witness or in denying appellant's motion for continuance. Accordingly, we shall affirm the judgments below.

### Facts

On the evening of September 28, 2006, appellant and two teenage male friends went to the home of Lindsay Wise and asked to borrow a hammer. After obtaining a hammer from Ms. Wise's roommate, the three left.

Later that evening three men entered a gun shop around the corner from Ms. Wise's home. Upon entering the shop, one of the men leapt over a gated half-door, separating the office area from the rest of the shop, and engaged in a tussle with the owner of the shop, striking him several times with a "silver object." While they were struggling, one of the other men picked up three handguns from the display area and laid them on the counter, where they were retrieved by the third man. The three men then left the shop with the guns. The entire incident lasted less than a minute. Unfortunately, because the men wore dark, hooded sweatshirts, and the shop owner was held from behind during his scuffle with one of the three intruders, he was unable to provide the police with a detailed description of any of them. He did inform the police, however, that his assailant wore a baseball hat and that he was black.

When Sergeant Johnny Murray of the Hagerstown Police Department arrived at the gun shop that night to investigate the robbery, he was informed by the shop's owner that several guns had been stolen. The next day, the owner turned over to police a baseball cap, which he had found in his shop. At trial, appellant admitted the cap was his.

The day after the robbery, appellant was at Ms. Wise's house. At that time, Ms. Wise saw appellant show her roommate guns that he had in his backpack. She then overheard him tell her roommate that he had gotten the guns

from the gun shop the night before, that he had been in an altercation with the shop's owner, and that he had lost his hat but was not sure whether he had lost it in the shop or on the street.

Appellant was ultimately convicted of robbery and second-degree assault and sentenced to a term of fifteen years imprisonment.

## Discussion

### I.

On the day of trial, the prosecutor asked the court to remove three spectators from the courtroom during Ms. Wise's testimony: appellant's father, Glenn Goode; Ms. Wise's next door neighbor, Millie Myers; and a Donald Norris.[1] In support of that request, the prosecutor advised the court:

> There has been a significant amount of almost witness intimidation going on between the uh from the defendant to Miss Wise and including the defendant's family, specifically his father [Glenn Goode] and Miss Wise's next door neighbor, Millie Myers. As a matter of fact there was even contact with Miss Wise last night. Miss Wise, I—my concern is that she is going to further feel intimidated. Those people are here in the courtroom. I would ask the court to exclude them from the courtroom when she testifies only so that she can, she can tell the truth, that she can speak freely and not be further intimidated. The intimidation has been going on for quite some time your Honor.

Appellant's counsel opposed the request, stating in part: "I don't think there is any indication other than displeasure at her [Ms. Wise's] appearance here today that she has been intimidated. I'd ask that the persons who are here on behalf of my client, his family, not be excluded from this proceeding." The court took the matter under advisement and the prosecutor called the responding police officer, Sergeant Murray, and

---

1. The record provides no other identifying information regarding Mr. Norris.

the shop's owner to testify. After their testimony was taken the prosecutor called Ms. Wise to the stand. Following a delay, noted by the court and counsel, she entered the courtroom.

The prosecutor then renewed her request to exclude certain spectators from the courtroom:

[PROSECUTOR]: ... the State renews its motion to exclude certain persons from the courtroom.

THE COURT: Specifically?

[PROSECUTOR]: I apologize, I don't know the defendant's father's name, but the—

[DEFENSE COUNSEL]: Mr. Glenn Goode is Mr. Longus' father.

THE COURT: Glenn Goode, okay.

[PROSECUTOR]: Miss Millie Myers.

THE COURT: Okay.

[PROSECUTOR]: Mr. Don–Don Norris.

THE COURT: Okay. Basis?

[PROSECUTOR]: They have been threatening Ms. Wise over a period of time.

THE COURT: [Defense Counsel]?

[DEFENSE COUNSEL]: Your Honor, with respect to the State's motion, I will not argue with respect to Mr. Goode because I know that Mr. Goode is concerned for his son and may have had some involvement with communications with this witness. With respect to the other persons, I believe they are known to this community who know everyone involved. I don't believe there is any evidence they threatened anyone and I believe it is improper to exclude members of the public from a trial. Trials are supposed to be open to the public.

THE COURT: The uh—Glenn Goode, the father of the defendant—(Defendant enters the courtroom.) The defendant has now joined us. There is a motion pending, Mr. Longus, to exclude Glenn Goode, Millie Myers and Donald Norris from the testimony of Lindsay Wise. The uh—Mr.

Goode is the defendant's father. I don't believe that there is a particular objection from the defendant as to that individual. It's my understanding that Millie Myers has made certain allegations regarding the defendant or regarding this witness?

[PROSECUTOR]: Your Honor, I can tell the court that she has facilitated phone calls from the defendant to Miss Wise so that when Miss Wise sees her phone and sees her caller I.D. she believes it's Millie Myers, she answers the phone and it's the defendant. We've had that happening. We've also had communications where the defendant would tell Ms. Myers something and Ms. Myers would then pass that message along to uh this witness, specifically comments about needing to leave town and not to testify.

THE COURT: And as to Donald Norris?

[PROSECUTOR]: Your Honor, just last night there was a communication between the defendant and Ms. Wise that was actually a four-way conversation facilitated by Don–Don Norris as well as Millie Myers and her daughter, Amy.

The court then ruled as follows:

THE COURT: Okay. All right. Trials are public in nature, however, in order to move things along it is sometimes necessary to restrict movement into the courtroom and the presence of certain people under the circumstances. I find that there is extraordinary cause to grant the request of the State and for the testimony of Lindsay Wise, both direct, cross and redirect. The uh—Glenn Goode, Millie Myers and Donald Norris are removed from the courtroom, although other people are allowed back in. All right Deputy? Thank you. Bring the jury in please.

I will also note for the record that there was approximately about seven to eight minutes when the State was attempting to get the witness in the courtroom and apparently she was having some difficulty entering the courtroom as a result of all of this.

Ms. Wise then took the stand and testified in part as follows:

[PROSECUTOR]: The—Have you ever testified before?

WISE: No.

[PROSECUTOR]: When your name was called a little bit earlier, you seemed to have some difficulty coming into the courtroom, why is that?

WISE: Because I was scared. [PROSECUTOR]: Sorry?

WISE: I was scared.

[PROSECUTOR]: What are you scared of?

WISE: Testifying.

[PROSECUTOR]: Why?

WISE: I'm scared what will happen afterwards, if anything.

After the prosecutor examined Ms. Wise about the events of September 25 and 26, 2006, her testimony concluded with the following exchange:

[PROSECUTOR]: And Ms. Wise—After this trial here today, do you intend to return home to 106 Buena Vista?

WISE: No ma'am.

[PROSECUTOR]: Why?

WISE: Scared.

. . .

[PROSECUTOR]: Do you recall meeting with Detective Brandt in a green Chevy Lumina?

WISE: Yes. Yes.

[PROSECUTOR]: And were you, were you inclined to testify as [sic] that time?

WISE: No. No.

[PROSECUTOR]: Okay. Why have you had a change of heart? Why are you here today?

WISE: Because I have been able to work out plans. I don't have to go home. I don't have to go back to the previous address.

[PROSECUTOR]: And part of those plans that you have made, you expect to be assisted by the State to help you relocate, is that right?

WISE: Yes.

Appellant contends that the circuit court erred in granting the State's request to exclude Millie Myers and Donald Norris (but not Glenn Goode) from the courtroom during Ms. Wise's testimony and thereby violating his Sixth Amendment right to a public trial. Specifically, appellant claims that the trial court "failed to follow the requirements" of *Waller v. Georgia*, 467 U.S. 39, 48, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), which instructs when, under the Sixth Amendment, a criminal trial may be closed to the public.

The Sixth Amendment to the United States Constitution guarantees the right to a public trial. It provides in part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...." A public trial "furnishes the public with the opportunity to observe the judicial process, and thus ensures that the 'judge and prosecutor carry out their duties responsibly.'" *Walker v. State*, 125 Md.App. 48, 68, 723 A.2d 922 (1999) (quoting *Waller, supra*, 467 U.S. at 46, 104 S.Ct. 2210). Indeed, "[t]he knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." *In re Oliver*, 333 U.S. 257, 270, 68 S.Ct. 499, 92 L.Ed. 682 (1948). It thus is "a safeguard against any attempt to employ our courts as instruments of persecution." *Id.* And, finally, it "'encourages witnesses to come forward and discourages perjury.'" *Walker, supra*, 125 Md.App. at 69, 723 A.2d 922 (quoting *Waller, supra*, 467 U.S. at 46, 104 S.Ct. 2210).

But "the right to a public trial is not absolute." *Carter v. State*, 356 Md. 207, 214, 738 A.2d 871 (1999). *Accord Walker v. State*, 121 Md.App. 364, 370, 709 A.2d 177, *cert. denied*, 351 Md. 5, 715 A.2d 964 (1998) ("The privilege of the public to attend trials is not [ ] unrestricted.") The trial court is accorded some discretion in determining whether any or all of the public should be excluded from a criminal trial. *Id.* (citing *Dutton v. State*, 123 Md. 373, 387, 91 A. 417 (1914)). *See also Bell v. Evatt*, 72 F.3d 421, 433 (4th Cir.1995) ("The

trial judge may impose reasonable restrictions on access to a trial in the interest of the fair administration of justice."). This discretion, however, must be exercised sparingly and only after applying the following four-part test:

(1) the party seeking closure of the courtroom advances an overriding interest that is likely to be prejudiced;

(2) the closure is no broader than necessary to protect that interest;

(3) reasonable alternatives to closing the proceedings are considered by the trial court; and

(4) findings adequate to support the closure are made by the trial court.

*Waller, supra,* 467 U.S. at 48, 104 S.Ct. 2210. *See also Watters v. State,* 328 Md. 38, 44–45, 612 A.2d 1288 (1992) (applying four-part test set forth in *Waller*).

In reviewing whether the trial court abused its discretion in denying or limiting access to a criminal trial, an appellate court looks to whether the trial court, in so doing, applied these factors. Although *Waller* addressed a total closure of the courtroom during a suppression hearing, (leaving only court personnel, witnesses, the parties, and their lawyers in the courtroom), the factors set forth above are applicable to partial closures, that is, where only certain persons are barred from the courtroom during a particular witness's testimony, as occurred in this case. *See, e.g., Walker, supra,* 125 Md.App. at 69–70, 723 A.2d 922.

In partial, temporary closures cases, however, many federal [2] and state [3] courts have modified the first factor by holding

---

**2.** The following United States Courts of Appeal have adopted the less stringent "substantial reason" for the partial closure of a courtroom: *Woods v. Kuhlmann,* 977 F.2d 74,76 (2nd Cir.1992); *United States v. Osborne,* 68 F.3d 94, 98–99 (5th Cir.1995); *United States v. Farmer,* 32 F.3d 369, 371 (8th Cir.1994); *United States v. Sherlock,* 962 F.2d 1349, 1356–57 (9th Cir.1989); *Nieto v. Sullivan,* 879 F.2d 743, 753 (10th Cir.1989); and *Douglas v. Wainwright,* 739 F.2d 531, 532–33 (11th Cir.1984) (per curiam), but the Fourth Circuit, has not, as yet. In *Bell v. Jarvis,* 236 F.3d 149, 168 n. 11 (4th Cir.2000), a sexual misconduct

that a closure will be upheld if the trial court finds a "substantial reason" for doing so, a less demanding requirement than *Waller's* "overriding interest." Those courts have adopted the less stringent "substantial reason" test for partial closures in recognition that a partial courtroom closure does not "implicate the same secrecy and fairness concerns that a total closure does." *Woods v. Kuhlmann*, 977 F.2d 74, 76 (2nd Cir.1992). We agree and, for the same reason, shall adopt the position of a majority of state and federal courts that, when closure is partial, the substantial reason test provides adequate protection of the defendant's right to a public trial.

■ Relying on *Holt v. State*, 129 Md.App. 194, 741 A.2d 519 (1999), and *Guzman v. Scully*, 80 F.3d 772 (2nd Cir.1996), appellant claims that the State did not satisfy the first prong of the *Waller* test for three reasons: First, the prosecutor proffered that Myers and Norris had merely facilitated conversations between appellant and Ms. Wise and there was no claim that they had actually threatened her. In appellant's precise words, "the worst that the prosecutor proffered was that [ ] Myers had passed along [his] 'comments [to Ms. Wise]

case, the United States Court of Appeals for the Fourth Circuit acknowledged that other federal appellate courts had "relaxed the first *Waller* requirement where a temporary or partial closure of a proceeding is at issue," but it indicated that it did not need to decide then whether to follow, because the Court "believe[d] it to be settled that the state's interest in protecting minor rape victims [was] a compelling one," which justified the closure during the sexual abuse victim's testimony. (Internal citations omitted.)

3. The following state courts have also applied the "substantial reason" standard in partial courtroom closure cases. *See, e.g., ex parte Easterwood*, 980 So.2d 367 (Ala.2007); *Feazell v. State*, 906 P.2d 727, 729 (Nev.1995); *State v. Garcia*, 561 N.W.2d 599, 605 (N.D.1997); *State v. Drummond*, 111 Ohio St.3d 14, 2006–Ohio–5084, 854 N.E.2d 1038 (2006); *State v. Sams*, 802 S.W.2d 635, 640 (Tenn.Crim.App.1990); *Andrade v. State*, 246 S.W.3d 217, 225 (Tex.App.2007). *But see State v. Mahkuk*, 736 N.W.2d 675, 685 (Minn.2007) (recognizing that some federal circuit courts, but not the Minnesota state courts, apply the "substantial reason" test in partial courtroom closure cases); and *People v. Jones*, 96 N.Y.2d 213, 726 N.Y.S.2d 608, 750 N.E.2d 524 (2001) (rejecting relaxation of "overriding interest" standard in partial closure cases.).

about having to leave town and not to testify.' " Second, the trial court erred in relying on the prosecutor's proffer of witness intimidation rather than on evidence to that effect. And third, the presence of Myers and Norris in the courtroom would not have prevented Ms. Wise from testifying because, although she was slow in entering the courtroom, when first called to the stand, "she was present and ready to testify before the judge ruled on the exclusion of the spectators."

We are satisfied that the State demonstrated a substantial reason for excluding Myers and Norris from the courtroom during Ms. Wise's testimony. The interest or reason was to secure testimony, uninfluenced by intimidation, from a witness who was fearful of testifying in the presence of both of them. *State v. Mahkuk*, 736 N.W.2d 675, 685 (Minn.2007) (recognizing the protection of witnesses from intimidation or retaliation is an "overriding state interest" which may justify a partial courtroom closure); *People v. Frost*, 100 N.Y.2d 129, 760 N.Y.S.2d 753, 790 N.E.2d 1182, 1188 (2003) (holding that the state advanced an "overriding interest" justifying partial courtroom closure based on witness's "legitimate fear" of testifying in open court); *Feazell v. State*, 111 Nev. 1446, 906 P.2d 727, 729 (1995) (holding an eyewitness's "personal safety qualifies as both a 'substantial reason' and an 'overriding interest' sufficient to justify partially closing the trial" during the witness's testimony where witness received two telephone calls telling her not to testify and found a dead bird in a plastic bag on her patio); *State v. Drummond*, 111 Ohio St.3d 14, 2006–Ohio–5084, 854 N.E.2d 1038, 1054 (2006) (holding that witnesses' "fear of retaliation" provided a "substantial reason" for partial closure of courtroom during their testimony).

In the instant case, the State identified three individuals by name, Goode, Myers, and Norris, and asserted that threats had been communicated to Ms. Wise by them, or with their help. Defense counsel did not oppose the exclusion of Glenn Goode (appellant's father) from the courtroom, stating, "I know that Mr. Goode is concerned for his son and may have had some involvement with communications with this witness." Thus, the State's proffer that Ms. Wise had been threatened

was essentially confirmed, at least as to Goode, by defense counsel.

With respect to Myers and Norris, however, defense counsel asserted: "I don't believe there is any evidence they threatened anyone and I believe it is improper to exclude members of the public from a trial." In response, the State proffered:

Your Honor, I can tell the court that [Myers] has facilitated phone calls from the defendant to Miss Wise so that when Miss Wise sees her phone and sees her caller I.D. she believes its Millie Myers, she answers the phone and it's the defendant. We've had that happening. We've also had communications where the defendant would tell Ms. Myers something and Ms. Myers would then pass that message along to uh this witness, specifically comments about needing to leave town and not to testify.

The circuit court then inquired as to Norris, and the State replied:

Your Honor, just last night there was a communication between the defendant and Ms. Wise that was actually a four-way conversation facilitated by Don–Don Norris as well as Millie Myers and her daughter, Amy.

Defense counsel did not dispute this proffer nor request a voir dire of Ms. Wise. Although it would have been preferable for the trial court to interview Ms. Wise on the record to ascertain the accuracy and extent of her fears, the trial court did note for the record that, when Ms. Wise was called to the stand "there was approximately about seven to eight minutes when the State was attempting to get the witness in the courtroom and apparently she was having some difficulty entering the courtroom as a result of all of this." Thus, the record is clear that the trial court observed Ms. Wise's demeanor and saw for itself that she was reluctant to enter the courtroom when first called to testify, apparently due to the presence of Goode, Myers, and Norris.

Of greater moment to the resolution of this issue than Ms. Wise's reluctance to enter the courtroom was Ms. Wise's testimony following her delayed entrance. This testimony

substantiated the prosecutor's representations that she was "scared" to testify and fearful her testimony would provoke some form of retaliation. We may consider this testimony even though it was given after Myers and Norris were excluded from the courtroom, because it was given when she first took the stand and before she gave any substantiative testimony concerning the case itself. Hence, her initial testimony, in effect, comprised a pre-testimonial examination, out of the presence of those whom she was fearful of, as to why she was reluctant to testify in their presence. Had the court found her testimony unconvincing, it was then free to allow Myers and Norris to re-enter the courtroom to hear what she had to say about the case itself and thereby eliminate the partial closure without any prejudice to appellant's right to a public trial. Lest any doubt remained as to the depth of her fears or to the genuineness of the prosecutor's concerns as to her safety, we note that Ms. Wise agreed to give her testimony only in return for relocation assistance, which the State agreed, under the circumstances, to provide.

Moreover, appellant's reliance on *Holt, supra,* and *Guzman, supra,* for the proposition that the State failed to advance an adequate reason for the closure is misplaced. Holt and his brother were charged with murder and conspiracy to distribute heroin and cocaine. During the trial, the State requested that the courtroom be cleared of *all* spectators while a key witness, in protective custody, testified. *Holt, supra,* 129 Md.App. at 200, 741 A.2d 519. The prosecutor advised the court that the witness, Clifton Gee, was present when two unknown men threatened another witness (who could not be located) about her potential testimony. The prosecutor was concerned that, if certain spectators remained in the courtroom during Gee's testimony, Gee, out of fear, would not testify truthfully. *Id.* at 200–01, 741 A.2d 519. She explained that Gee was afraid because the defendants "had people out on the street that he is being viewed and carefully, with an eye of what he looks like and to what is being said." *Id.* 199–200, 741 A.2d 519. She further claimed that "there are people in the audience who belong to the [defendants'] family and [Gee]

would be afraid to testify," pointing out that those same people "were not here yesterday." *Id.* at 201, 741 A.2d 519.

Holt's counsel opposed the request and challenged the prosecutor's assertion that the four spectators in the courtroom were not present the day before. Holt's counsel also noted that Gee was in protective custody and that no one (including defense counsel) knew Gee would be testifying that afternoon and, therefore, Gee could not have been threatened when no one knew he was a potential witness. *Id.* at 201–02, 741 A.2d 519.

The trial court granted the request and excluded all spectators from the courtroom without questioning Gee about the nature and basis of his fears or the excluded spectators about their relationship to the defendants. Declaring that "[a]s the proponent of the closure motion, [ ] it was incumbent on the State to produce evidentiary support that will provide the basis for the court to construct a narrowly tailored order to warrant closure," we held that under the circumstances presented, the trial court erred in clearing the courtroom based upon nothing more than the State's proffer. *Id.* at 207–08, 741 A.2d 519.

Our opinion in *Holt*, however, lends little support to appellant's claim that the court erred in excluding Myers and Norris. In *Holt*, the trial court cleared the courtroom of *all* spectators based merely on the prosecutor's general and unsubstantiated proffer that Gee was fearful of testifying because of threats made to another witness by two unknown men. In contrast, the court below excluded only Goode, Myers, and Norris, based on the prosecutor's statements that they were directly involved in threats made to Ms. Wise, while other members of the public were free to remain in the courtroom. Further, appellant did not dispute the prosecutor's representations; the circuit court observed firsthand Ms. Wise's reluctance to enter the courtroom; and, before she gave any substantiative testimony, Ms. Wise confirmed the prosecutor's representations by stating that she was fearful of testifying because of "what will happen afterwards."

Nor does *Guzman, supra,* bolster appellant's claim of error. Guzman was charged in the State of New York with second-degree murder and first- and second-degree criminal possession of a weapon. *Guzman, supra,* 80 F.3d at 773. The prosecutor requested that four women be excluded from the courtroom during the cross-examination of Nelson Cedeno, a witness for the prosecution. Two of the four women were related to another prospective witness who was "antagonistic" toward Cedeno because of the events related to the trial, and the prosecutor proffered that, for that reason, the women's presence intimidated Cedeno. *Id.* at 773–74. Without conducting any further inquiry, the trial court, over the objection of defense counsel, closed the courtroom to the four women during Cedeno's testimony. *Id.* at 774. The United States Court of Appeals for the Second Circuit found that to be error. It held that, by relying solely on the prosecutor's proffer of intimidation, the trial court violated the first *Waller* factor. It explained:

The trial court based its decision solely upon representations made by the prosecutor that Cedeno felt intimidated by the presence of these four women in the courtroom. The trial court, however, did not inquire of the witness whether he in fact felt intimidated nor whether his fear, if genuinely held, was sufficiently well-founded to constitute an 'overriding interest' within the meaning of *Waller,* or at least a 'substantial reason' within the meaning of *Woods v. Kuhlmann,* 977 F.2d 74 (2nd Cir.1992). Indeed, the trial court made no inquiry whatsoever.

. . .

Even more disturbing is the fact that when defense counsel pointed out that two of the women were *not* related to [the antagonistic witness], as the prosecutor had alleged, but were instead related to the defendant, the trial court still did not make any inquiry to ascertain the relevant facts.

. . .

Under the circumstances presented in this case, the trial court's partial closure of its courtroom violated Guzman's right to a public trial. This constitutional infirmity stems

primarily from the fact that the trial court relied on unsubstantiated statements of the prosecutor, rather than conducting an inquiry of the prosecution witness on whose behalf the closure request was made.

*Id.* at 775.

By contrast, in the instant case, when the prosecutor moved to exclude "certain persons from the courtroom," the circuit court asked for specifics, not only as to their identities, but also as to the "basis" for their exclusion. The prosecutor replied that they had been "threatening Ms. Wise over a period of time." Appellant's counsel then did not oppose the exclusion of appellant's father, stating that "I know that Mr. Goode is concerned for his son and may have had some involvement with communications with this witness." Upon further inquiry by the circuit court, the prosecutor then provided specific examples of intimidation by Myers and Norris. Based on that exchange, and on the circuit court's own observation that Ms. Wise "was having some difficulty entering the courtroom [when called to testify] because of all of this," the circuit court granted the request. Finally, as noted earlier, the circuit court had the benefit of hearing Ms. Wise, herself, confirm, when she first took the stand, that she was scared to testify because of "what will happen afterwards." Accordingly, we hold that the first *Waller* factor was satisfied in this case, namely, that the State advanced at least a substantial reason for the partial courtroom closure.

■ We turn now to the second *Waller* factor, that is, that an order barring the public from the courtroom must be no broader than necessary to protect the interest at stake. *Waller, supra,* 467 U.S. at 48, 104 S.Ct. 2210. Because the interest at stake in this case was protecting Ms. Wise and ensuring that her testimony was not the product of intimidation, excluding Myers and Norris from the courtroom during Ms. Wise's testimony was narrowly tailored to serve that interest. In so doing, the circuit court advised the deputy that "all other people are allowed back in." Accordingly, we are

satisfied that the partial closure was "no broader than necessary."

The third factor is whether the trial court considered reasonable alternatives to closing the courtroom. *Waller, supra,* 467 U.S. at 48, 104 S.Ct. 2210. Appearing to merge the second and third criteria, appellant contends that the trial court "should have considered a measure such as having [Myers and Norris] sit in the back of the courtroom," particularly in light of defense counsel's willingness to permit the removal of appellant's father from the courtroom.

When asked the basis of her request to exclude Myers and Norris from the courtroom during Ms. Wise's testimony, the prosecutor advised the circuit court that Myers had passed along messages from appellant, telling Ms. Wise to "leave town and not to testify" and that Myers and Norris had both facilitated and participated in phone conversations between appellant and Ms. Wise, including a phone call the evening before trial. After that proffer, appellant did not reiterate his objection to their removal nor propose any alternatives. Nor did he suggest, as he now does, that the court should have allowed them to sit in the back of the courtroom. Moreover, as previously noted, the circuit court observed firsthand Ms. Wise's "difficulty entering the courtroom as a result of all of this," apparently referring to the presence of Goode, Myers, and Norris.

Under such circumstances, we decline to conclude that the circuit court failed to consider alternatives to Myers and Norris's temporary exclusion from the courtroom merely because it did not articulate any alternatives to granting the exclusion requested, and, therefore, we find that the third *Waller* criterion was satisfied in this case. Moreover, while "*Waller* counsels trial courts to consider alternatives to a complete closure of a public proceeding," the Fourth Circuit observed "it is not unreasonable to conclude that *Waller* does not require a trial court, faced with minimal, indeed perfunctory, opposition to a request that a courtroom be temporarily closed [while a witness testifies], to invent and reject alterna-

tives to the proposed closure." *Bell, supra,* 236 F.3d at 169. Or, as more emphatically stated by the District of Columbia Court of Appeals: "The judge is not obliged to invent novel alternatives out of thin air, nor to bring up dubious options that the parties themselves have not ventured to propose, only subsequently to reject them." *Tinsley v. United States,* 868 A.2d 867, 879 (D.C.2005). We agree. Since the appellant saved his alternative recommendation of letting Myers and Norris sit in the back of the courtroom for appeal, we can hardly fault the circuit court for not considering it.

The fourth and final *Waller* factor is that the trial court set forth "findings adequate to support the closure." *Waller, supra,* 467 U.S. at 48, 104 S.Ct. 2210. *Accord Carter, supra,* 356 Md. at 221, 738 A.2d 871 ("[O]rdinarily, the trial judge must have stated the reason or reasons [for closing the courtroom] on the record. Only in that way will the public be able to be aware of the reasons for closure, and an appellate court able to review the adequacy of those reasons."). Because appellant does not claim that the circuit court failed to set forth adequate findings for excluding Myers and Norris from the courtroom during Ms. Wise's testimony, we need not give further consideration to the issue.

Having found that the trial court adequately complied with the criteria set forth in *Waller,* we hold that, in excluding Myers and Norris from the courtroom during Ms. Wise's testimony, the circuit court neither violated appellant's Sixth Amendment right to a public trial nor abused its discretion.

## II.

 Appellant's trial was originally scheduled for April 12, 2007. The day before trial was to begin, appellant filed a motion for continuance in which he requested a postponement of the trial in order to obtain the presence of a "necessary defense witness," D.B., a juvenile residing in Washington, D.C.[4] The motion stated that D.B., "one of the actors in the

---

4. Because the witness was a juvenile at the time and was involved in a juvenile proceeding as a result of his involvement in this incident, we

criminal incident for which [appellant was] charged," would "reportedly" testify that "a third party resembling [appellant] and having a similar 'dred-lock' hairstyle was the culprit misidentified as [appellant]." The motion also stated that D.B. was willing to appear in court, but his mother would not bring him because she believed that the juvenile court had forbidden her son's return to Hagerstown. Appellant requested a continuance "in order to obtain an out-of-state subpoena to compel the appearance of this witness and ask[ed] that this matter be rescheduled as soon as the Court's calendar permit[ted]."

The administrative judge granted the request, and the trial was delayed one month, until May 10, 2007. On the day before trial, defense counsel, once again, filed a motion for continuance asserting essentially the same grounds. The second motion, however, dropped the language in the first motion stating that D.B.'s mother mistakenly believed the juvenile court order prohibited her son's presence in Hagerstown and she would not, for that reason, bring him to appellant's trial, and asserted, instead, that "[c]ounsel had hoped that this witness would appear on his own, but the witnesses' [sic] mother has persistently and lately advised that she will refuse to bring him to court." It, therefore, requested another continuance "to permit [counsel] to continue to attempt to execute an out-of-state subpoena in the District of Columbia to compel the appearance of this witness."

On the morning of trial, the prosecutor opposed the motion for a continuance, prompting the following colloquy:

[PROSECUTOR]: It's my understanding that that motion for continuance based on ... the defense's missing witness, [D.B.], who is I believe located in Washington, D.C. You Honor, Joe Michael, as well as Detective Jurado and Sergeant Kifer went to the detention center last night and reviewed [appellant's] consensually [sic] recorded telephone conversations. There was a great effort last night on behalf of the defendant to obtain [D.B.] and have him come here

refer to him by his initials. *Muthukumarana v. Montgomery County,* 370 Md. 447, 458 n. 2, 805 A.2d 372 (2002).

and say that [appellant] is not the person that committed
this offense. It was—I did not hear those conversations
your Honor. If the Court wishes to hear from any of the
three that were there as well, Sergeant Nutter from the
sheriff's department, who is in charge of playing those
tapes, any one of those people could come in and tell the
Court that it was very clear to them that [D.B.] had no
intention of coming, that the family had no intentions of
letting him, he's 15 years old, they had no intentions of
letting him come to Maryland. He is in D.C. and they will
not let him come here. So the defense's—I put this on the
record your Honor so that in the future if there is an issue
about not having a witness present here, there was no
reasonable expectation of him ever being here your Honor.
Even if he was served with an out-of-state subpoena, he
would not be here.

THE COURT: Well I mean whether he was served with
an out-of-state subpoena or not, that issue isn't reached
from—There's nothing in the file to reflect that the Inter-
state Witness Act was implemented in this matter and the
motion to continue that I received yesterday was the same
as the motion to continue that was received back in early
April regarding [D.B.]. I had the pleasure of having [D.B.]
in front of me in the juvenile proceeding and as part of his
probation in that matter he was not to come into the State
of Maryland unless he was supervised by his mother. I
can't remember at this point whether I said another respon-
sible adult, but it was primarily intended that he would not
come in unless he was supervised by his mother. But
there's been no request under the Interstate Witness Act
and therefore I don't find that there is a valid reason at this
point in time to continue the matter ... to obtain [D.B.].
So that's where we are on that.

[DEFENSE COUNSEL]: Your Honor, my only concern
was that [D.B.'s] mother said to me that she can't bring her
son here because the Court has prohibited his appearance
here. I think she perhaps misunderstood the fact that he
could either come here in her custody. But her reason for

not producing him was that he [would] be in further trouble if he came here based on the Court's directive. And so I mean no disrespect to the Court, but I think the effect of disposing of [D.B.'s] case in juvenile court lead to the false belief on behalf of the mother that she would imperil her son and cause displeasure of the Court and imperil him if she were to bring him back here irrespective of what assistance it may provide to my client.

THE COURT: Okay. We've all been under the—We've all had to deal with the Interstate Witness Act and that statute provides a mechanism to get somebody into the State of Maryland. It provides for safe, safe transport and any, any kind of relief from trouble in the, in the requesting state. There was no request under the Interstate Act and therefore I understand where everybody is coming from, but the motion to continue has been denied.[5]

Appellant contends that the circuit court erred in denying his motion for a continuance. Specifically, he maintains that the testimony that he expected D.B. to give, that is, that appellant did not participate in the robbery, "was crucial to his defense"; that the case could not be tried fairly without that evidence; and that, while it was "true that counsel had not obtained an order under the Interstate Witness Act, he had contacted [ ] D.B.'s family and determined that [his] mother had ... mistakenly concluded that she was not allowed to bring her son into Maryland." Moreover, he points out that he requested that the trial be "rescheduled as soon as the court's calendar permits" and that a "brief continuance ... would have been long enough to allow appellant to obtain the witness from the District of Columbia."

 We review a trial court's denial of a motion for continuance under the abuse of discretion standard. *Abeokuto v. State*, 391 Md. 289, 329, 893 A.2d 1018 (2006). To establish

---

5. The "Maryland Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings" is codified at Md.Code Ann., Cts. & Jud. Proc. § 9–301, *et seq.* (2006 Repl. Vol.).

an abuse of discretion, the party requesting the continuance must show:

(1) that he had a reasonable expectation of securing the evidence of the absent witness or witnesses within some reasonable time; (2) that the evidence was competent and material, and he believed that the case could not be fairly tried without it; and (3) that he had made diligent and proper efforts to secure the evidence.

*Smith v. State,* 103 Md.App. 310, 323, 653 A.2d 526 (1995) (internal citations omitted).

In this case, appellant requested and received a continuance to obtain the presence of D.B. at trial. That continuance delayed his trial for one month. On the day before the re-scheduled trial date, appellant filed another motion for continuance based on the very same reasons he set forth in his first request. As observed earlier, however, the second motion for continuance did not include the language in the first motion that D.B.'s mother mistakenly believed the juvenile court order prohibited her son's presence in Hagerstown but asserted, instead, that D.B.'s mother "has persistently and lately advised that she will refuse to bring him to court."

Moreover, there was no indication in the second motion, nor in defense counsel's oral argument before the circuit court, that any attempts had been made to serve D.B. with a subpoena or secure his attendance at trial in the month between the granting of the first continuance and the motion for the second continuance. Nor did the defense rebut or even challenge the prosecutor's proffer that, based on appellant's detention center recorded telephone conversation with D.B. and members of D.B.'s family the night before trial, "it was very clear ... that [D.B.] had no intention of coming, that the family had no intentions of letting him ... come to Maryland."

Thus, there was a sound basis for the circuit court to conclude that appellant did not have a "reasonable expectation" of obtaining D.B.'s presence at trial "within some reasonable time" and that appellant did not make "diligent and

proper efforts" to secure his presence, both before and after he obtained a continuance to do so. Accordingly, we hold that the trial court did not abuse its discretion in denying appellant's second motion for continuance. *Accord Wilson v. State,* 345 Md. 437, 449, 693 A.2d 344 (1997) ("A court is not ordinarily obliged to continue or interrupt a trial when the defendant has failed to subpoena a witness in a proper and timely manner.").

**JUDGMENTS OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**